UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JUSTIN ALFONSO,

                              Petitioner,

        v.

JAMIE LAMANNA, SUPT.,

                              Respondent.

No. 18-CV-4607 (KMK) (PED)

ORDER ADOPTING REPORT &
RECOMMENDATION

Appearances:

Justin V. Alfonso
Wallkill, NY
*Pro Se Petitioner*

Kirsten A. Rappleyea, Esq.
Dutchess County District Attorney's Office
Poughkeepsie, NY
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

        Justin Alfonso ("Petitioner"), proceeding pro se, has filed a Petition for Writ of Habeas

Corpus (the "Petition") pursuant to 28 U.S.C. § 2254, challenging his June 4, 2013 conviction,

following a jury trial in New York Supreme Court, Dutchess County ("County Court"), for one

count of Conspiracy in the Second Degree, two counts of Attempted Murder in the Second

Degree, one count of Assault in the First Degree, one count of Attempted Assault in the First

Degree, one count of Attempted Gang Assault in the First Degree, one count of Criminal

Possession of a Weapon in the Second Degree, and one count of Grand Larceny in the Fourth

Degree.  (*See generally* Pet. For Writ of Habeas Corpus ("Pet.") (Dkt. No. 1).)

In a Report & Recommendation ("R&R") dated April 6, 2022, Magistrate Judge Paul E. Davison ("Judge Davison") recommended that the Petition be denied in its entirety. (*See* Report & Recommendation ("R&R") 1 (Dkt. No. 17).) Petitioner filed an Objection to the R&R on June 7, 2022 after seeking and receiving an extension of time to object. (*See* Pet'r's Obj. to R&R ("Obj.") (Dkt. No. 26).) Respondent has not responded to the Objection. (*See generally* Dkt.) After a review of the R&R and the Petitioner's Objection, the Court adopts the result recommended in the R&R and denies the Petition.

## I. Background

The factual and procedural background of this case is set forth in the thorough R&R and the Court assumes the Parties' familiarity therewith. (*See* R&R 1–12.) The Court nevertheless summarizes the facts relevant to the instant Petition and Objection.

### A. Factual Background

Between March 4, 2012 and March 6, 2012, Petitioner, along with six other accomplices and members of the Almighty Latin King and Queen Nation ("Latin Kings") conspired to kill Ruben Rivera ("Rivera") and Kym Perez-Colon ("Perez-Colon") on "direct order" from the leaders of the Latin Kings, for violations of the group's "laws." (*Id*. at 2.)

On March 5, 2012, Petitioner and three other members of the Latin Kings went to Rivera and Perez-Colon's apartment ("the apartment") to persuade Rivera to leave the apartment, though they were unsuccessful. (*Id.*)[1] The next day, Petitioner and one of his co-conspirators

_____

[1] The Court notes that the exact number of individuals present during the interaction remains unclear, though immaterial to the instant Petition. The R&R states that Petitioner was accompanied by three other members of the Latin Kings rather than five as listed here. However, multiple filings refer to at least four other people who went to Rivera's apartment on March 5, 2012. (*See, e.g.* Aff. of Bridget R. Rahilly Steller ("Steller Aff") ¶ 5 (Dkt. No. 8) (listing co-defendants Herrera-Garcia, Monroe, Negron, and Price as present, in addition to

stole a .45 caliber pistol, picked up four other Latin Kings members, and drove to the apartment. (Steller Aff. ¶ 5.)  After the group gained entry into the apartment, Petitioner shot Rivera in the face and Perez-Colon in the chest.  (*Id.*)  Rivera was also stabbed by another co-defendant with a knife.  (*Id.*)  Petitioner and the group of co-defendants then left the apartment complex, and Petitioner hid the pistol at 246 Church Street in Poughkeepsie.  (*Id.*)

While on the way to the hospital with Perez-Colon, City of Poughkeepsie Police Detective Robert Perrotta ("Detective Perrotta") asked Perez-Colon who harmed her.  (R&R 2.) Perez-Colon identified several individuals by name, including Petitioner.  (*Id.*)  Later that night, Perez-Colon identified Petitioner from a photo array that had been previously prepared in connection to an unrelated crime in which the Latin Kings were suspected to have been involved. (*Id.* at 2–3.)  This photo array contained six images of members of the Latin Kings, with the names of each person blacked out at the bottom.  (*Id.* at 3.)  Perez-Colon identified Petitioner as the individual in photograph 2, initialing the bottom of the photograph.  (*Id.*; *see also* Steller Aff Ex. 17 ("Suppression Hr'g Op."), at 3 (Dkt. No. 8-17).)

On the evening of March 6, 2012 and into the morning of March 7, 2012, Detective Perrotta interrogated Petitioner about his involvement in the shooting.  (R&R 3.)  At the start of the interrogation, Detective Perrotta told Petitioner that he needed to fill out a "bullshit form," delineating Petitioner's *Miranda* rights.  (Steller Aff. Ex. 66 ("Perrotta Cross"), at 68:22–69:15 (Dkt. No. 8-66).)  While administering these rights, Detective Perrotta told Petitioner that he could "potentially help himself and get a chance to hit a home run" if Petitioner spoke to the detective.  (*Id.* at 99:12–100:5.)  At some point, Petitioner stated: "I would like to have a lawyer

---

Petitioner); Resp't's Opp'n to Pet. ("Resp't's Opp'n"), at 26 (Dkt. No. 11) (listing co-defendants Negron, Sellers, Monroe, Price, and Herrera-Garcia as present).)

present, but there's no one around, so I'll talk to you." (Suppression Hr'g Op. 4.)[2]  Petitioner

also asked for his mother to be present in the room. (Perrotta Cross 67:21–68:3.)[3]  At another

point in the interview, Detective Perrotta told Petitioner that in his "younger days," Detective

Perrotta "would have bounced [Petitioner] off five . . . walls" but if Petitioner was "straight" with

him, Detective Perrotta would "treat him right." (*Id.* at 95:14–97:3.)  Finally, Detective Perrotta

did not ask Petitioner if he had taken any drugs or alcohol prior to questioning him because "he

did[] [not] appear [to] be under the influence of any illegal substance."  (Pet. 43.)  Following this

interview, Petitioner led the police to the location of the pistol used in the shooting.  (Perrotta

Cross at 100:10-21.)

### B.  Pre-trial Suppression Hearing

Prior to the start of the trial, Petitioner moved to suppress, among other things, the pre-

trial statements arising from his questioning with Detective Perrotta and any fruits of those

statements, arguing that the statements were taken in violation of his right to counsel.

(Suppression Hr'g Op. 1–2.)  The County Court held a *Huntley-Wade* hearing on January 9,

2013, ultimately denying the motion.  (*See generally* Suppression Hr'g Op.)

The County Court found that "[t]he manner and language employed by Detective Perrotta

in advising [Petitioner] of his *Miranda* rights could be characterized as inappropriate at a

minimum," calling Detective Perrotta's description of the *Miranda* rights form "uncalled for."

---

[2] Another formulation of this conversation is regularly cited in appellate briefing and in
the R&R.  Stated another way, Petitioner asked Detective Perrotta for a lawyer.  (Perrotta Cross
68:8–13.)  Detective Perrotta responded by asking whether Petitioner really wanted a lawyer, to
which Petitioner responded only if Detective Perrotta could get one right away.  (*Id.*)

[3] While the Court cannot identify any information in the trial record about Detective
Perrotta's response, Petitioner states that Detective Perrotta told Petitioner that "his mother was
not necessary because he was 'of age.'"  (Pet. 42.)

(*Id*. at 5.)  Moreover, the County Court found that Detective Perrotta's comments about bouncing suspects off the walls was "unnecessary and hostile."  (*Id*.)  However, the court found that these comments did not "psychologically or physically coerce[] the [Petitioner] into making his statement."  (*Id*.)  The court also found that Petitioner's request for counsel was "equivocal at best and did not constitute an invocation of the right to counsel."  (*Id*. at 6.)

C.  Trial History

The case proceeded to trial on April 23, 2013 and lasted until June 1, 2013.  (Steller Aff. Ex. 45, at 13:18-21 (Dkt. No. 8-45); Steller Aff. Ex, 70, at 89 (Dkt. No. 8-70).)  During the trial, the prosecution offered testimony from twenty different witnesses, including three co-defendants and the two victims, Rivera and Perez-Colon.  (R&R 5.)

Co-defendants Miosotys Herrera-Garcia ("Herrera-Garcia"), Keanan Monroe ("Monroe"), and Nyquez Price ("Price") testified that they were with Petitioner at the apartment to execute the "direct order" to kill the victims on March 6, 2012.  (Steller Aff Ex. 58, at 29:19-30:6 (Dkt. No. 8-58) (testimony of Herrera-Garcia); Steller Aff. Ex. 61, at 63:20–64:8 (Dkt. No. 8-61) (testimony of Monroe); Steller Aff. Ex. 59, at 156:21–157:25 (Dkt. No. 8-59).)  Herrera-Garcia testified that she moved to the left of the doorframe when Petitioner started firing the gun. (Steller Aff. Ex. 59, at 50:15–51:20.)  Herrara-Garcia also testified that she did not actually see Petitioner shoot Rivera or Perez-Colon, but heard the sound of the gun being fired.  (*Id*.)  Herrera-Garcia also testified that Petitioner's co-defendants were all standing next to him when he fired the gun.  (*Id*. at 52:8–17.)  Monroe testified that he was tasked with ensuring that Petitioner carried out the "direct order" to kill the victims.  (Steller Aff. Ex. 62, at 68:1-13 (Dkt. No. 8-62).)  Monroe also testified that he stood next to Petitioner when Petitioner first fired the gun.  (*Id*. at 70:13-72:13.)  Finally, Price testified that he saw Petitioner shoot Rivera and Perez-

Colon.  (Steller Aff. Ex. 60, at 94:1–13 (Dkt. No. 8-60).)[4]  Finally, both victims identified

Petitioner as the shooter.  (Steller Aff Ex. 50, at 133:14–135:4 (Dkt. No. 8-50) (Perez-Colon

testimony identifying Petitioner, stating that "he fired the first two shots"); Steller Aff. Ex. 54, at

6:24–7:18 (Dkt. No. 8-54) (Rivera testimony identifying Petitioner, stating "I saw him shoot me.

He shoots me.  I fall down.  I get back up.  He shoots again.  [Petitioner] shoots me again.").)

　　　After the prosecution rested its case, Petitioner moved to dismiss his case pursuant to

C.P.L. § 290.10(1)(a), on the grounds that the evidence presented at trial was legally insufficient.

(Steller Aff. Ex. 67, at 172:19–175:2 (Dkt. No. 8-67).)  The County Court denied Petitioner's

motion.  (*Id*. at 176:22–177:6.)  Shortly thereafter, the jury returned a unanimous verdict of

guilty on all charges: one count of Conspiracy in the Second Degree, two counts of Attempted

Murder in the Second Degree, one count of Assault in the First Degree, one count of Attempted

Assault in the First Degree, one count of Attempted Gang Assault in the First Degree, one count

of Criminal Possession of a Weapon in the Second Degree, and one count of Grand Larceny in

the Fourth Degree.  (Steller Aff. Ex. 70, at 111:2–112:21.)  On July 15, 2013, the County Court

denied Petitioner youthful offender treatment and sentenced Petitioner as follows: (1) 8 to 25

years' imprisonment on the Conspiracy charge; (2) two 25 year terms imprisonment for the

Attempted Murder charges; 3) 15 years' imprisonment on the Assault charge; 4) 10 years'

imprisonment on the Attempted Assault charge; 5) 15 years' imprisonment on the Attempted

Gang Assault and Gang Assault charges; 6) 10 years' imprisonment on the Criminal Possession

of a Weapon charge; and finally 7) 1 to 5 years' imprisonment on the Larceny charge.  (Steller

Aff. Ex. 28, at 15:7–19:3 (Dkt. No. 8-28).)  The County Court directed that the sentences for the

---

[4] Price previously testified in the grand jury that he was not in the vicinity at the time of the shooting, but recanted this at trial.  (R&R 7; *see also* Steller Aff. Ex. 60, at 94:9-95:20.)

Conspiracy count, the two Attempted Murder counts, and the Larceny count run consecutively, and that the sentences for the remaining counts run concurrently.  (*Id*.)

### D.  Appellate Procedural History

Petitioner, through counsel, directly appealed his conviction to the Second Department on April 30, 2015.  (Pet. 27–156.)  As relevant to the instant Objection, Petitioner argued that the constitutional integrity of *Miranda* was compromised by the tactics used in the interrogation process.  (*Id*. at 63–83.)  While the Appellate Division affirmed the judgment on September 28, 2016, the court reversed the County Court's decision from the *Huntley-Wade* hearing, holding that the County Court should have suppressed Petitioner's statements to the police.  *People v. Alfonso*, 38 N.Y.S.3d 566, 568–69 (App. Div. 2016).  The Appellate Division recounted the interview, highlighting Detective Perrotta's admission that he was trying to "downplay" the *Miranda* form and "minimize [its] importance."  *Id*. at 568 (alterations in original).  The court found that "undermined the *Miranda* warnings and rendered them ineffective in advising the [Petitioner] of his rights."  *Id*. at 569.  However, the court nonetheless concluded that this error was "harmless beyond a reasonable doubt" because the there was an "overwhelming" amount of evidence of Petitioner's guilt, even without Petitioner's statements.  *Id*.

On July 1, 2016, Petitioner's counsel sought leave to appeal the Appellate Division's decision before the New York Court of Appeals, arguing that the Appellate Division erred by holding the admission of his interrogation statements as harmless error.  (Steller Aff. Ex. 21, at 2–3 (Dkt. No. 8-21).)  The New York Court of Appeals denied Petitioner's motion for leave to appeal on March 22, 2017.  *People v. Alfonso*, 76 N.E.3d 1080 (N.Y. 2017).

The instant Petition was received by the Clerk's Office and filed on May 23, 2018.  (*See generally* Pet.)  Respondent filed a Memorandum of Law opposing the Petition on August 17,

2018.  (*See* Resp't's Opp'n; Steller Aff.)  Judge Davison issued the R&R on April 6, 2022, recommending that this Court deny Petitioner's request for relief and dismiss the Petition in its entirety.  (*See* R&R.)  After three extensions, Petitioner subsequently filed his timely Objection.  (*See* Obj.)

## II.  Discussion

### A.  Applicable Law

#### 1.  Review of a Magistrate Judge's R&R

A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by a magistrate judge."  28 U.S.C. § 636(b)(1).  Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to the magistrate judge's report and recommendation.  The objections must be "specific" and "written," FED. R. CIV. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Federal Rules of Civil Procedure 5(b)(2)(C)–(F), *see* FED. R. CIV. P. 6(d), for a total of seventeen days, *see* FED. R. CIV. P. 6(a)(1).

Where a party submits timely objections to a report and recommendation, as Petitioner has done here, the Court reviews de novo the parts of the report and recommendation to which the party objected.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3).  The district court "may adopt those portions of the . . . report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law."  *Eisenberg v. New Eng.*

*Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y. 2008) (quoting FED. R. CIV. P. 72(b)(2)).

Finally, pleadings submitted by pro se litigants are held to a less strict standard than those drafted by attorneys. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) ("Even in the formal litigation context, pro se litigants are held to a lesser standard than other parties." (italics omitted)). Because Petitioner is proceeding pro se, the Court construes his pleadings "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (italics and quotation marks omitted). However, this "does not exempt a [pro se litigant] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

2.  Standard of Review

Petitions for writs of habeas corpus are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides that a state prisoner may seek habeas corpus relief in federal court "on the ground that he is in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). "The writ may not issue for any claim adjudicated on the merits by a state court unless the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States,' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012) (quoting 28 U.S.C. § 2254(d)(1)–(2)). In this context, "it is the habeas applicant's burden to show that the state court applied [federal law] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam);

*see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("The petitioner carries the burden of proof.").

A decision is "contrary to" clearly established Federal law if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  A decision is "an unreasonable application of clearly established Federal law" if a state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08 (alterations and quotation marks omitted).  "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions.  And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citations and quotation marks omitted); *see also id.* (noting that a petitioner must show a state court ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement" (quotation marks omitted)); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

"Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quotation marks omitted).  Consequently, a federal court must deny a habeas petition in some circumstances even if the

court would have reached a conclusion different than the one reached by the state court, because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102; *see also Cullen*, 563 U.S. at 202–03 ("Even if the [Federal] Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the [state court] to conclude that [the petitioner] did not establish prejudice."); *Hawthorne v. Schneiderman*, 695 F.3d 192, 197 (2d Cir. 2012) ("Although we might not have decided the issue in the way that the [New York State] Appellate Division did—and indeed we are *troubled by the outcome we are constrained to reach*—we . . . must defer to the determination made by the state court . . . ." (emphasis added) (citation omitted)).

Additionally, under AEDPA, the factual findings of state courts are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1); *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir. 1997) ("When reviewing a habeas petition, the factual findings of the New York Courts are presumed to be correct." (alteration and quotation marks omitted)).  The petitioner must rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003) (same).

Finally, only Federal law claims are cognizable in habeas proceedings.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also* 28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in

behalf of a person in custody pursuant to the judgment of a State court only on the ground that he

is in custody in violation of the Constitution or laws or treaties of the United States.").

### 3.  Procedural Requirements for Habeas Corpus Relief

"Habeas review is an extraordinary remedy," *Bousley v. United States*, 523 U.S. 614, 621

(1998), and a petitioner seeking a writ of habeas corpus must comply with the strict requirements

of AEDPA, *see* 28 U.S.C. § 2254.  Before the Court reviews the merits of a habeas corpus

petition, the Court must determine whether Petitioner complied with the procedural requirements

set forth in 28 U.S.C. §§ 2244 and 2254.

### a.  Timeliness

AEDPA imposes upon a petitioner seeking federal habeas relief a one-year statute of

limitations.  *See* 28 U.S.C. § 2244(d)(1).  The statute of limitations is tolled if any state post-

conviction proceedings are pending after the conviction becomes final.  *See* 28 U.S.C.

§ 2254(d)(2).  The limitations period is also subject to equitable tolling, which is warranted only

when a petitioner has shown "(1) that he [or she] has been pursuing his [or her] rights diligently,

and (2) that some extraordinary circumstances . . . prevented timely filing." *Finley v. Graham*,

No. 12-CV-9055, 2016 WL 47333, at *5 (S.D.N.Y. Jan. 4, 2016) (alterations in original)

(quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

### b.  Procedural Bar

A federal court "will not review questions of federal law presented in a habeas petition

when the state court's decision rests upon a state-law ground that is independent of the federal

question and adequate to support the judgment."  *Downs v. Lape*, 657 F.3d 97, 101 (2d Cir.

2011) (quotation marks omitted).  A judgment is "independent" if the "last state court rendering

a judgment in the case clearly and expressly states that its judgment rests on a state procedural

bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quotation marks omitted).  A procedural bar is "adequate . . . if it is based on a rule that is firmly established and regularly followed by the state in question." *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006) (quotation marks omitted). In "exceptional cases," the "exorbitant application of a generally sound [state procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376 (2002).

### c.  Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citation and quotation marks omitted); *see also* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . .").  To satisfy this requirement, "the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29 (quotation marks omitted); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the state, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.").  This requirement reflects important "notions of comity between the federal and State judicial systems." *Strogov v. Att'y Gen. of State of N.Y.*, 191 F.3d 188, 191 (2d Cir. 1999).

There are two components to the exhaustion requirement.  *See McCray v. Bennet*, No. 02-CV-839, 2005 WL 3182051, at \*7 (S.D.N.Y. Nov. 22, 2005) ("A two-step analysis is used to determine whether a claim has been exhausted . . . .").  First, "a petitioner [must] fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011) (alterations and quotation marks omitted); *see also Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (same); *Oliver v. Kirkpatrick*, No. 06-CV-6050, 2012 WL 3113146, at \*5 (E.D.N.Y. July 31, 2012) (same).  This requirement is satisfied if the claim is presented in a way that is "likely to alert the [state] court[s] to the claim's federal nature," *Carvajal*, 633 F.3d at 104 (quoting *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000)), and the state courts are "apprise[d] . . . of both the factual and the legal premises of the federal claims ultimately asserted in the habeas petition," *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005); *see also Bermudez v. Conway*, No. 09-CV-1515, 2012 WL 3779211, at \*8 (E.D.N.Y. Aug. 30, 2012) (same).  In other words, a state prisoner need not cite "chapter and verse of the Constitution" to satisfy this requirement.  *Carvajal*, 633 F.3d at 104 (quotation marks omitted).  A petitioner may satisfy this requirement by:

> (a) reliance on pertinent federal cases employment constitutional analysis[;]
> (b) reliance on state cases employing constitutional analysis in like fact situations[;]
> (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution[;] and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.* (quotation marks omitted).  However, it is "not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made."  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citation omitted).  Rather, the claims must be made in such a way so as to give the state courts a "fair opportunity to apply

14

controlling legal principles to the facts bearing upon his constitutional claim." *Id.* (quotation marks omitted).

"Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim." *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981), *overruled on other grounds*, *Daye v. Att'y Gen.*, 696 F.2d 186, 195 (2d Cir. 1982) (en banc); *see also Pettaway v. Brown*, No. 09-CV-3587, 2010 WL 7800939, at *9 (S.D.N.Y. May 3, 2010) (same), *adopted by* 2011 WL 5104623 (S.D.N.Y. Oct. 26, 2011).  In New York, "a criminal defendant must first appeal his or her conviction to the Appellate Division, then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez*, 394 F.3d at 74.  If the petitioner fails to exhaust his or her state remedies through the entire appeal process, he or she may still fulfill the exhaustion requirement by collaterally attacking the conviction via available state methods.  *See Klein*, 667 F.2d at 282–83 (noting that, "where the petitioner did not utilize all the appellate procedures of the convicting state to present his claim . . . the petitioner must utilize available state remedies for collateral attack of his conviction in order to satisfy the exhaustion requirement"); *Bernardez v. Bannon*, No. 12-CV-4289, 2016 WL 5660248, at *3 (S.D.N.Y. Sept. 29, 2016).  For example, in New York a defendant may challenge a conviction based on matters not in the record that could not have been raised on direct appeal, *see* N.Y. CRIM. PROC. LAW § 440.10, but a defendant may not seek collateral review of claims that could have been raised on direct appeal and were not, *see id.* § 440.10(2)(c); *see also O'Kane v. Kirkpatrick*, No. 09-CV-5167, 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011) ("Under New York law, all claims that are record-based must be raised in a direct appeal . . . . It is only when a defendant's claim hinges upon facts

outside the trial record, that he may collaterally attack his conviction by bringing a claim under

[New York Criminal Procedure Law] § 440.10.), *adopted by* 2011 WL 3918158 (S.D.N.Y.

Aug. 25, 2011).  In addition, New York permits only one application for direct review.  *See*

*Jiminez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) ("[The petitioner] has already taken his one

direct appeal [under New York law] . . . . ").  "New York procedural rules bar its state courts

from hearing either claims that could have been raised on direct appeal but were not, or claims

that were initially raised on appeal but were not presented to the Court of Appeals."  *Sparks v.*

*Burge*, No. 12-CV-8270, 2012 WL 4479250, at *4 (S.D.N.Y. Sept. 18, 2014).

Accordingly, in those situations, a petitioner no longer has any available state court

remedy, and the claims are therefore deemed exhausted, but procedurally defaulted.  *See*

*Carvajal*, 633 F.3d at 104 ("If a habeas applicant fails to exhaust state remedies by failing to

adequately present his federal claim to the state courts so that the state courts would deem the

claim procedurally barred, we must deem the claim procedurally defaulted." (alteration and

quotation marks omitted)); *see also Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (noting the

reality that deeming an unpresented claim to be exhausted is "cold comfort").  A dismissal of a

habeas petition on such grounds is a "disposition . . . on the merits."  *Carvajal*, 633 F.3d at 104

(quotation marks omitted).  "An applicant seeking habeas relief may escape dismissal on the

merits of a procedurally defaulted claim only by demonstrating 'cause for the default and

prejudice' or by showing that he is 'actually innocent' of the crime for which he was convicted."

*Id.* (quoting *Aparicio*, 269 F.3d at 90); *see also Dretke v. Haley*, 541 U.S. 386, 388 (2004)

(holding that "a federal court will not entertain a procedurally defaulted constitutional claim in a

petition for habeas corpus absent a showing of a cause and prejudice to excuse the default," or

showing that the petitioner "is actually innocent of the underlying offense").

16

B.  Analysis

Petitioner makes seven arguments in support of his Petition: (1) the constitutional integrity of his *Miranda* warning was compromised by the interrogation tactics of Detective Perrotta and his subsequent admissions did not amount to harmless error; (2) Perez-Colon's identification of Petitioner was infected by suggestiveness and Petitioner was improperly excluded from *Sandoval* discussions; (3) Petitioner "was deprived of his right to be present during a material stage of his trial because the *Antommarchi* waiver was not made until jury selection was over," and Perez-Colon's 911 call should have been suppressed; (4) the evidence adduced at trial warranted the entry of an acquittal; (5) there was prosecutorial misconduct warranting the declaration of a mistrial; (6) Petitioner was denied a fair trial "due to an inadequate jury charge"; and (7) "accepted sentencing principles were overlooked" during Petitioner's sentencing.  (Pet. 1–18.)  Judge Davison dismissed all seven claims.  (*See* R&R 17–23.)

Petitioner objects only to Judge Davison's finding that the admission of Petitioner's post-arrest statements amounted to harmless error.  (*See generally* Obj.)  Judge Davison found that, "[e]ven assuming, *arguendo*, that Petitioner's statements were obtained in violation of his *Miranda* rights, the Appellate Division nonetheless did not err in finding that the admission of the statements were harmless," because "the prosecution's case against Petitioner was overwhelming."  (R&R 18–19.)  Petitioner appears to raise two arguments in opposition: 1) that the Appellate Division and Judge Davison "failed to consider the Petitioner's age at the time of the interview" in conducting its *Miranda* analysis; and 2) that without Petitioner's statements, he could not be convicted because "everything else is hearsay."  (Obj. 1–2.)  The Court will address both arguments in turn.

1.  Standard for Harmless Error

In § 2254 cases, "a court must assess the prejudicial impact of constitutional error in a state-court criminal trial" under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which states that "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht*, 507 U.S. at 631); *see also Wood v. Ercole*, 644 F.3d 83, 93–94 (2d Cir. 2011) (applying the *Brecht* standard); *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) ("Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict.") (quoting *Brecht*, 507 U.S. at 637).

"An error was harmless unless it resulted in 'actual prejudice,' meaning that a court has 'grave doubt about whether' the error" substantially and injuriously affected the verdict. *Orlando v. Nassau Cnty. Dist. Att'y Off.*, 915 F.3d 113, 127 (2d. Cir 2019) (quoting *Davis v. Ayala*, 576 U.S. 257, 267–68 (2015)). "When a state court makes a harmless error determination on direct appeal, we owe the 'harmlessness determination itself' deference under [AEDPA]." *Id*. (quoting *Davis*, 567 U.S. at 269). "[A] state-court decision is not unreasonable if fairminded jurists could disagree on its correctness." *Davis*, 567 U.S. at 269 (citation and quotation marks omitted). Therefore, a petitioner must show "that the state court's decision . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond *any possibility* for fairminded disagreement. *Id*. at 269–70 (citation and quotation marks omitted).

"In assessing an error's likely impact on the jury, 'the Supreme Court has found the following factors to be relevant . . . (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the

wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence.'" *United States v. Lombardozzi*, 491 F.3d 61, 76 (2d Cir. 2007) (quoting *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004)). "The strength of the prosecution's case, however, 'is probably the single most critical factor.'" *Id.* (quoting *United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006)).

### 2.  Application

Here, Petitioner is understandably not contesting the Appellate Division's determination that his *Miranda* warnings were ineffective.  Instead, Petitioner reiterates his arguments that the interrogation statements "never should have been used on a 17[-]year[-]old youth who requested his mother be present."  (Obj. 1.)  While sympathetic to Petitioner's concerns, this Court will not spill significant ink relitigating a *Miranda* claim that has already been deemed an error by appellate courts.  Petitioner's argument is misplaced here: whether or not Judge Davison "failed to consider the Petitioner's age at the time of the interview" is irrelevant to the question at hand. (*Id.*)[5]  Judge Davison's charge with respect to *Miranda* was not to determine yet another reason why the *Miranda* warnings were rendered ineffective.  Instead, Judge Davison rightfully

---

[5] Petitioner also asserts that the Appellate Division failed to consider Petitioner's age at the time of the interrogation.  (Obj. 1.)  Petitioner is correct that the court did not refer to his age at the time of the interrogation. *See generally Alfonso*, 38 N.Y.S.3d.  However, assuming arguendo that Petitioner requests a different result from the Appellate Division, this omission does not render the decision unreasonable.  Indeed, the Supreme Court has held that "a state-court decision that failed to mention a 17-year-old's age as a part of the *Miranda* custody analysis was not objectively unreasonable" under AEDPA. *J.D.B. v. North Carolina*, 564 U.S. 261, 276 (2011) (discussing *Yarborough v. Alvarado*, 541 U.S. 652, 666–69 (2004)).  The Supreme Court continued, finding that while a child's age may be considered in the totality-of-the-circumstances approach to the custody inquiry, it will not "be a determinative, or even a significant factor in every case." *Id.* at 277.

While Petitioner may wish that the Appellate Division mentioned every alternative ground upon which the court believed Petitioner's *Miranda* warnings were rendered ineffective, neither the Appellate Division nor this Court is required to do so.

analyzed whether the County Court's inclusion of the interrogation statements constituted

harmless error.  (R&R 18–20.)  As such, the Court finds Petitioner's argument about his age at

the time of the interrogation unpersuasive.

Turning now to Petitioner's second argument, Petitioner argues that the *Miranda*

deficiencies cannot be considered harmless as a matter of law because without his statements,

police would have never found the pistol used in the shooting and "everything else [presented as

evidence in trial against Petitioner] was hearsay."  (Obj. 2.)  Judge Davison concluded that even

without Petitioner's admission, "the state's evidence was sufficient to convict Petitioner."  (R&R

20 (quoting *Loucks v. Capra*, 2019 WL 2330295, at *14 (S.D.N.Y. Apr. 22, 2019), *report and

recommendation adopted*, 2019 WL 2326225 (S.D.N.Y. May 30, 2019).)  For the reasons stated

below, the Court agrees.

To start, "Petitioner failed to articulate which statements were allegedly improper

[hearsay], [rendering the Objection] facially insufficient to meet Petitioner's burden 'to show

that the state court applied federal law to the facts of his case in an objectively unreasonable

manner.'"  *May v. Griffin*, 2021 WL 5450346, at *18 (S.D.N.Y. Nov. 19, 2021) (alterations

omitted) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).  Construed liberally, Petitioner

seems to be incorporating arguments raised by counsel in a prior application to the Court of

Appeals, namely that "the testimony apart from the gun revealed that the offenses were intended

to be a 'beat-down' with no intent to kill" and that "there was no eyewitness and no one ever saw

who fired the weapon."  (Pet. 21–22.)

This Court adds yet another voice to the chorus of determinations in this case: the

evidence against Petitioner was "overwhelming."  (R&R 19 ("[T]he prosecution's case against

Petitioner was overwhelming."); *see also Alfonso*, 38 N.Y.S.3d at 569 ("[T]he evidence of

[Petitioner's] guilt . . . is overwhelming.").)  Three former co-defendants testified that they were with Petitioner at the victims' apartment to execute the "direct order" to kill the victims, or "terminate on sight."  *See supra* I.A.C.  Monroe testified that he was specifically tasked by superiors in the Latin Kings with ensuring that Petitioner carried out the order.  (Steller Aff. Ex. 62, at 68:1-13.)  Moreover, Petitioner's counsel's assertion that "no one ever saw who fired the weapon" is patently false given testimony at trial.  While Price's testimony may be disputed given inconsistencies between his testimony before the grand jury and at trial, Monroe did indeed testify that he stood next to Petitioner when he first fired the gun.  (*Id.* at 70:13-72:13.) Herrera-Garcia also offered testimony that she moved to the left of the doorframe at the apartment, right before Petitioner started firing the gun.  (Steller Aff. Ex. 59, at 50:15–51:20.) More importantly, *both victims* positively and conclusively identified Petitioner as the person who shot them.  (Steller Aff Ex. 50, at 133:14–135:4 (Perez-Colon testimony identifying Petitioner, stating that "he fired the first two shots"); Steller Aff. Ex. 54, at 6:24–7:18 (Rivera testimony identifying Petitioner, stating "I saw him shoot me.  He shoots me.  I fall down.  I get back up.  He shoots again.  [Petitioner] shoots again.").)

However, the prosecution did not solely rely on this eyewitness testimony to build its case against Petitioner.  Among other things during this month-long trial, prosecutors introduced surveillance video showing Petitioner entering the apartment at approximately 4:30pm, and leaving the building around 4:53pm, shortly before the police responded to reports of the shooting.  *Alfonso*, 38 N.Y.S.3d at 569.   In addition, Perez-Colon identified Petitioner as the shooter in a photo array on the night of the shooting.  (Suppression Hr'g Op. 3.)[6]  Moreover, this

---

[6] The Court notes Petitioner's argument that Perez-Colon's identification of Petitioner was "infected by suggestiveness," but declines to weigh in given that Petitioner did not lodge an objection to Judge Davison's finding on this issue.

Court agrees with Judge Davison's assessment that Petitioner's statement "disclosing to police . . . the location of the gun" was not "critical to the prosecution's case."  (R&R 20.)

Thus, Petitioner's statement and the inclusion of the gun did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Fry*, 551 U.S. at 116 (quotation marks and citation omitted).  Accordingly, Petitioner is not entitled to habeas relief on his harmless error claim, and Judge Davison's recommendation on this point is adopted.

### III.  Conclusion

The Court, having conducted a thorough review of the remainder of the R&R, finds no error, clear or otherwise.  The Court therefore adopts the outcome of Judge Davison's R&R. Petitioner's writ of habeas corpus is accordingly dismissed with prejudice.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Patrol*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a [petitioner's] good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and noting that an appeal may not be taken in forma pauperis if the County Court certifies in writing that it was not taken in good faith).

The Clerk of the Court is respectfully directed to enter judgment in favor of Respondent, send a copy of this Order to Petitioner at the address listed on the docket, and close the case.

SO ORDERED.

DATED:          October 24, 2022

                White Plains, New York

_____

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE